IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | No. 12-112-01 |
| v. | : | |
| | : | |
| PATRICIA McGILL | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    May 13, 2016

I.    BACKGROUND............................................... 2

      A. Procedural History .................................. 2

      B. Essential Elements of the Offense ................... 7

II.   STANDARD OF REVIEW....................................... 8

      A. Motion for Judgment of Acquittal .................... 8

      B. Motion for New Trial ................................ 9

III.  DEFENDANT'S MOTION FOR ACQUITTAL....................... 10

      A. Evidence that Medicare is a Health Care Benefit Program
         that Affects Interstate Commerce ................... 11

         1. Effect on Interstate Commerce ................... 13

         2. Health Care Benefit Program ..................... 17

      B. Evidence of Defendant's Intent to Defraud Medicare ... 19

      C. Proof of Knowledge of Section 1347 and Medicare
         Regulations ........................................ 28

         1. Role of Medicare Regulations .................... 29

         2. 2010 Amendment to Section 1347 .................. 33

      D. McGill's Nonparticipation in Billing ................ 40

      E. Statute of Limitations ............................. 44

      F. Government Agent's Role in Counts 4 and 9 ........... 47

IV.   MOTION FOR NEW TRIAL................................... 51

V.    CONCLUSION............................................. 52

On February 8, 2016, a jury found Defendant Patricia McGill guilty of four counts of health care fraud, in violation of 18 U.S.C. § 1347. Before the Court is Defendant's Renewed Motion for Judgment of Acquittal. In the alternative, Defendant seeks a new trial pursuant to Federal Rule of Criminal Procedure 33. The Court held a hearing on the motion on April 13, 2016. For the reasons that follow, the Court will deny Defendant's motion.

## I.   BACKGROUND

### A.   Procedural History

On March 21, 2012, Defendant Patricia McGill, a registered nurse ("RN"), was charged by indictment with conspiring to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count One), and thirteen substantive counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts Two through Fourteen). Fifteen other defendants charged with various levels of involvement in the same healthcare fraud scheme entered guilty pleas or were convicted at trial.

The charges in this case revolved around the conduct of Defendant and others in connection with the operation of a hospice services company located in Northeast Philadelphia.[1]

_____

[1]     The circumstances leading to the convictions of other defendants in this case were described by this Court and the Third Circuit in United States v. Shvets, 631 F. App'x 91 (3d

Home Care Hospice, Inc. ("HCH"), a for-profit hospice services provider, was incorporated in 1999 under the laws of the Commonwealth of Pennsylvania. HCH was in the business of providing hospice services for patients at nursing homes, hospitals, and private residences. HCH received Medicare, Medicaid, and private insurance reimbursement for providing home care and in-facility care to purportedly terminally ill patients with life expectancy prognoses of six months or less.

Defendant McGill served as HCH's Director of Nursing and Clinical Services commencing in or about 2005. In this capacity, McGill was responsible for the planning, implementation, and evaluation of hospice services in accordance with local, state, and federal regulations. McGill supervised HCH's nursing staff; her work included reviewing staff documentation and patient charts to assure quality and appropriateness for hospice service and maintaining records of patient visits.

Defendant McGill was charged with knowingly authorizing the admission and maintenance of patients ineligible for hospice services, resulting in fraudulent health care insurance claims submitted by HCH totaling approximately

---

Cir. 2015); United States v. Goldman, 607 F. App'x 171 (3d Cir. 2015); and United States v. Kolodesh, No. 11-464, 2014 WL 1876214 (E.D. Pa. May 12, 2014), aff'd, 787 F.3d 224 (3d Cir. 2015).

$9,328,000, and authorizing HCH staff to falsely document higher, more costly levels of hospice services, resulting in fraudulent claims totaling approximately $325,000.

Defendant McGill's trial was delayed for almost four years, largely due to her challenge to her competency to stand trial. The Court continued the trial on several occasions to allow for McGill's medical evaluation, an evidentiary hearing, and briefing on the issue. Ultimately, on August 18, 2015, McGill was found competent to stand trial.

Prior to trial, the parties each filed several motions in limine and other dispositive motions. The Government filed the following motions:

- A motion requesting submission of a copy of the redacted indictment to the jury during deliberations (ECF No. 251), which the Court granted (ECF No. 411);

- A motion to admit recordings of intercepted conversations (ECF No. 306), which the Court granted pursuant to a stipulation by the parties (ECF No. 391); and

- A motion to admit certain exhibits as business records (ECF No. 307), which the Court granted, subject to certain conditions (ECF No. 391).

Defendant, in turn, filed the following eight pretrial motions:

- A motion for a hearing to determine the admissibility of alleged co-conspirators' statements and to establish the

4

order of proof to prove a conspiracy (ECF No. 356), which the Court denied (ECF No. 384);

- A motion to bar inflammatory language (ECF No. 357), which the Court denied as premature (ECF No. 384);

- A motion for disclosure of forged or altered documents and a bill of particulars (ECF No. 358), which the Court denied (ECF No. 384);

- A motion to compel identification of Brady and Giglio material (ECF No. 359), which the Court denied (ECF No. 384);

- A motion to bar admission of peer comparison data and estimate evidence (ECF No. 361), which the Court denied (ECF No. 384);

- A motion to strike or amend the indictment to conform to the statute of limitations (ECF No. 367), which the Court denied (ECF No. 384);

- A motion to compel discovery (ECF No. 369), which the Court denied as moot (ECF No. 391); and

- A motion to dismiss Counts Two through Fourteen of the Indictment as violative of due process rights under the void for vagueness doctrine, or, in the alternative, a motion to properly define the hospice regulation to the jury (ECF No. 380), which the Court denied (ECF No. 391).

Before the trial, Defendant also filed a notice of defense, asserting entrapment by estoppel and a public authority defense. ECF Nos. 360, 378. The Government moved to exclude both defenses. ECF No. 381. The Court granted the Government's motion to exclude the public authority defense, but denied the Government's motion as to entrapment by estoppel. ECF No. 391. Ultimately, however, Defendant did not request that the jury be instructed as to entrapment by estoppel.

The trial began on January 7, 2016. After the close of the Government's case, Defendant moved for a judgment of acquittal as to all charges, a motion which the Court took under advisement. On February 12, 2016, the jury returned its verdict after approximately three and a half days of deliberation. The jury convicted Defendant of four counts of health care fraud (Counts 3, 4, 9, and 14), and acquitted her of conspiracy to commit health care fraud (Count 1) and the other nine health care fraud counts. ECF No. 423. Defendant is scheduled to be sentenced on May 24, 2016. ECF No. 426.

On February 17, 2016, Defendant filed a renewed motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and, in the alternative, for a new trial pursuant to Rule 33. ECF No. 428. The Government responded to this motion, ECF No. 429, and the Court held a hearing on April 13, 2016. ECF No. 431. Following the hearing, Defendant submitted a

supplemental letter brief in support of her motion. ECF No. 432.
The Government, in turn, submitted a response to Defendant's
supplemental letter brief. ECF No. 433. Accordingly, the motion
is now ripe for disposition.

      B.   <u>Essential Elements of the Offense</u>

        Health care fraud--the offense as to which McGill was
convicted--is criminalized by 18 U.S.C. § 1347, which provides
in relevant part that:

> Whoever knowingly and willfully executes, or attempts
> to execute, a scheme or artifice--
>
> (1)  to defraud any health care benefit program; or
>
> (2)  to obtain, by means of false or fraudulent
> pretenses, representations, or promises, any of
> the money or property owned by, or under the
> custody or control of, any health care benefit
> program,
>
> > in connection with the delivery of or
> > payment for health care benefits, items, or
> > services, shall be [guilty of a crime.]

A "health care benefit program" is defined as "any public or
private plan or contract, affecting commerce, under which any
medical benefit, item, or service is provided to any individual,
and includes any individual or entity who is providing a medical
benefit, item, or service for which payment may be made under
the plan or contract." 18 U.S.C. § 24(b).

## II.   STANDARD OF REVIEW

### A.   Motion for Judgment of Acquittal

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When faced with a Rule 29 motion, the court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001) (citing Jackson v. Virginia, 443 U.S. 307 (1979)). The court "must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (citing United States v. Jannotti, 673 F.2d 578, 581 (3d Cir. 1982)). To that end, all reasonable inferences must be drawn in favor of the jury's verdict. United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996). Thus, the defendant seeking relief under Rule 29 bears "a very heavy burden." United States v. Anderson, 108 F.3d 478, 481 (3d Cir. 1997). "[A] finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294

F.3d 473, 477 (3d Cir. 2002) (quoting <u>United States v. Leon</u>, 739 F.2d 885, 891 (3d Cir. 1984)).

    B.   <u>Motion for New Trial</u>

       Upon a defendant's motion under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Motions for new trial in the interest of justice are committed to the sound discretion of the district court. <u>United States v. Brennan</u>, 326 F.3d 176, 189 (3d Cir. 2003). Under Rule 33, the court does not view the evidence in the light most favorable to the government but rather must exercise its own judgment in assessing the government's case. <u>United States v. Silveus</u>, 542 F.3d 993, 1004 (3d Cir. 2008). However, "[a] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred--that is, that an innocent person has been convicted.'" <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002) (quoting <u>United States v. Santos</u>, 20 F.3d 280, 285 (7th Cir. 1994)).

## III. DEFENDANT'S MOTION FOR ACQUITTAL

Defendant raises several arguments in her motion.[2] First, she asserts that the Government failed to present sufficient proof that Medicare was a health care benefit program affecting commerce as required by 18 U.S.C. § 1347. Second, she argues that Alex Pugman's testimony negated the Government's proof that she intended to defraud Medicare. Third, she argues that the health care fraud statute, § 1347, is void for vagueness as applied to her conviction, because the Government did not prove that she had specific intent to violate § 1347 and the underlying Medicare regulations alleged in the Indictment. Fourth, she maintains that the Government failed to prove that she personally submitted bills to Medicare or assisted anyone in submitting them. Fifth, she argues that the statute of limitations barred the counts of conviction, because the Government presented evidence of conduct that occurred before March 21, 2007. And sixth, she submits that the convictions for Counts 4 and 9 are insufficient, because a cooperating government witness, Richard Barber, falsified the patient records at issue in those counts. The Court will address each of these arguments in turn.

---

[2] The arguments presented by defense counsel at the April 13, 2016, hearing varied in certain respects from the arguments presented in Defendant's brief. The Court will note these differences where relevant.

10

A.  Evidence that Medicare is a Health Care Benefit Program that Affects Interstate Commerce

Defendant first argues that the Government presented insufficient evidence that Medicare is a health care benefit program affecting interstate commerce, an element of health care fraud under 18 U.S.C. § 1347, because no government witness testified (1) about the effect on interstate commerce, or (2) that Cahaba Government Benefit Administrators, LLC ("Cahaba"), the Medicare contractor that interfaced with HCH, was a "health care benefit program." Defendant therefore submits that there was insufficient evidence to convict her of health care fraud. Def.'s Mot. Acquittal at 6-7, ECF No. 428.

At the conclusion of the trial, the Court instructed the jury that to convict Defendant of health care fraud in violation of § 1347, the Government was required to prove beyond a reasonable doubt that:

91.  First:  That the defendant, Patricia McGill, knowingly and willfully devised or participated in a scheme to defraud Medicare and to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of Medicare in connection with the delivery of or payment for health care benefits, items, or services;

92.  Second:  That Patricia McGill acted with the intent to defraud; and

93.  Third:  That Medicare was a public plan or contract, affecting commerce, under which medical

11

> benefits, items, or services were provided to any individual.

Jury Instrs. ¶¶ 90-93.

As to the third element, the Court instructed the jury as follows:

> 107. The third element that the government must prove beyond a reasonable doubt is that Medicare is a "health care benefit program." A "health care benefit program" is any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

> 108. The government must prove beyond a reasonable doubt that the public plan or contract affected or could have affected interstate commerce. Affecting interstate commerce means any action, which in any way, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among states. The effect can be minimal.

Id. ¶¶ 107-08. The Government was therefore required to prove that Medicare (1) affects commerce and (2) provides medical benefits, items, or service in exchange for payment under the plan or contract. Defendant contends that the Government presented insufficient evidence as to both prongs. The Court will address each argument in turn.

1.   <u>Effect on Interstate Commerce</u>

Defendant first argues that "[t]he government simply forgot to put on evidence of the commerce element of the offense of health care fraud," Def.'s Suppl. Br. at 2, ECF No. 432, because "no government witness testified about any interstate commerce effect." Def.'s Mot. Acquittal at 7.

The Third Circuit has held that 18 U.S.C. § 24(b)'s inclusion of the phrase "affecting commerce" in the definition of "health care benefit program" is a jurisdictional element, which signals Congress's intent to invoke its full authority under the Commerce Clause. <u>United States v. Whited</u>, 311 F.3d 259, 268 (3d Cir. 2002). While the Third Circuit has not specifically addressed the quantity of evidence necessary to establish that a health care benefit program affects interstate commerce, it has observed that "[g]iven the complex state of modern health care delivery, it is difficult to envision any public or private health care plan or contract that does not affect commerce." <u>Id.</u> Thus, this prerequisite "in actuality likely eliminates little from the scope of the statute's operation." <u>Id.</u> Nonetheless, "if there is in fact a set of health care benefit programs that do not affect commerce, the presence of the jurisdictional element will properly exclude them." <u>Id.</u>

Here, the Court instructed the jury that "affecting commerce" means affecting interstate commerce and that it need only find a "minimal" effect on interstate commerce to conclude that the Government has met its burden. Jury Instrs. ¶ 108. Defendant does not argue that Medicare's effect on interstate commerce is too attenuated or trivial to give rise to federal jurisdiction in this case. Instead, she argues that the Government did not present <u>any</u> evidence of an actual effect on interstate commerce.

The Court is not persuaded by this argument. The Government presented sufficient evidence from which a rational jury could infer an actual impact on interstate commerce. The Government's Medicare expert, Jean Stone, testified that Medicare is a federal health insurance program with millions of beneficiaries that processes billions of claims every year. Gov't App. ¶ 12.[3] In particular, Stone described the electronic bill submission and claims reimbursement systems used by Medicare and its contractors, including Cahaba. <u>Id.</u> ¶ 4.

Defendant contends that Stone's testimony concerning "millions" of Medicare beneficiaries is insufficient to give

---

[3]     The Government has asked that its Appendix of Evidence, which it attached to its response to Defendant's motion, be filed under seal due its inclusion of patients' names and medical information. The Court will grant this motion and will refer to patients by their initials only throughout this Memorandum.

rise to an inference of an effect on interstate commerce, because there are millions of Medicare beneficiaries within Pennsylvania alone. Def.'s Suppl. Br. at 1. In support of this argument, she points to a report prepared by the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services, showing that over two million individuals living in Pennsylvania were enrolled in Medicare in 2007. Def.'s Suppl. Br. Ex. 1, ECF No. 432-1.

Notwithstanding that Defendant never presented this report during the trial and it therefore may not be considered by the Court as part of the record, the report does not undermine the jury's verdict. When reviewing a motion for judgment of acquittal, the Court's task is not to find the one possible set of facts or one interpretation of the evidence upon which the jury's verdict cannot stand. Rather, the Court is to "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." Wolfe, 245 F.3d at 261. A rational jury could have properly found beyond a reasonable doubt that the millions of beneficiaries referenced by Stone resided in states other than Pennsylvania and concluded that Medicare affects interstate commerce by processing and paying out claims on a national scale.

15

Further, the Government presented other evidence of Medicare's effect on interstate commerce. For instance, Alex Pugman, HCH's owner, testified that HCH electronically submitted biweekly claims to Cahaba, Medicare's fiscal intermediary, which was located in Des Moines, Iowa, during the relevant time period. Gov't App. ¶ 4; Gov't Ex. 12. Pugman also identified Federal Express air bills that HCH used to send patient files from its Philadelphia office to Cahaba's Des Moines office during an audit. Gov't Ex. 26-4, at 67. In addition, Special Agent Matthew Hirschy testified that Medicare did not reimburse HCH separately for the costs of supplies and equipment provided to hospice patients and that HCH purchased these items from funds that Medicare transferred to HCH through the electronic payment system. Gov't App. ¶ 130. He further testified that Medicare electronically transferred approximately $44 million to HCH during the relevant time period. Id. ¶ 131.

From this evidence, a rational jury could have inferred an actual effect on interstate commerce. As the Court instructed, such effect need only be "minimal." For that reason, the Court will deny Defendant's motion for acquittal on this ground.[4]

---

[4]    In its response, the Government directs the Court to Third Circuit law developed under the Hobbs Act, 18 U.S.C. § 1951, which contains similar "affects commerce" language. The Government notes that other circuits have looked to case law

2.   <u>Health Care Benefit Program</u>

At the hearing on Defendant's motion for a judgment of acquittal, defense counsel argued, for the first time, that Cahaba, the Medicare contractor that processed HCH's claims, is not a health care benefit program. In her supplemental letter brief, she again raised this argument, asserting that the Centers for Medicare and Medicaid Services ("CMS") does not fit the statutory definition of health care benefit program, because it "does not provide medical benefits, items or services to

---

developed under the Hobbs Act when interpreting the "affects commerce" term in the health care fraud statute. Gov't's Resp. at 8-9. The Government points to case law interpreting the Hobbs Act's "affects commerce" element as requiring only a "potential, not actual" effect on interstate commerce. <u>United States v. Powell</u>, 693 F.3d 398, 402 (3d Cir. 2012). Defendant, however, suggests that upholding her conviction based on a "potential" interstate commerce effect would be improper, because the jury was not instructed that it need only find a potential effect and the Government did not object to the instructions requiring the jury to find an actual effect on commerce.

If the Court were to borrow from precedent under the Hobbs Act, the Government was not required to present evidence as to an actual effect on interstate commerce in this case. Rather, the evidence was sufficient if the jury could infer a potential effect. <u>Cf.</u> <u>United States v. Urban</u>, 404 F.3d 754, 762 (3d Cir. 2005) (upholding a jury instruction directing that "[y]ou do not even have to find that there was an actual effect on commerce. All that is necessary to prove this element is that the natural consequences of the extortion . . . potentially caused an effect on interstate commerce to any degree, however minimal or slight"). However, the Court need not determine whether Hobbs Act jurisprudence requiring only a potential effect on interstate commerce should be extended to the health care fraud statute, § 1347, because, as explained above, the Court finds there is sufficient evidence of <u>actual</u> effect on interstate commerce to sustain the jury's verdict.

individuals" itself, and the Government never presented evidence
as to an agency relationship between Cahaba, CMS, and the
Medicare program. Def.'s Suppl. Br. at 1-2.

The Third Circuit explained the relationship between
Medicare and these entities in an appeal brought by one of
McGill's co-defendants:

> Medicare, as is well known, is a federal health
> benefits program providing financial assistance to
> senior and disabled citizens to cover medical costs.
> Fischer v. United States, 529 U.S. 667, 671 (2000).
> "Medicare attains its objectives through an elaborate
> funding structure," id. at 673, one aspect of which
> involves reimbursement to health care providers for
> medical treatment costs incurred in furnishing
> services to Medicare recipients, id. at 677, 680.
> Providers are reimbursed by the Centers for Medicare
> and Medicaid Services ("CMS") through a "fiscal
> intermediary," which is a private entity that
> contracts with CMS to help it administer the Medicare
> program by determining payment amounts and making
> payments. 42 U.S.C. §§ 1395h(a), 1395kk-1(a); 42
> C.F.R. § 405.902; see also Fischer, 529 U.S. at 677.

United States v. Kolodesh, 787 F.3d 224, 229-30 (3d Cir. 2015).
Cahaba is one such Medicare fiscal intermediary. Id. at 231.

As the Government correctly explains in it
supplemental response, "[t]he question is not whether CMS or
Cahaba . . . is a health care benefit program," but rather
whether Medicare is such a program. Gov't's Suppl. Resp. at 3,
ECF No. 433. The Government presented sufficient evidence that
"CMS and Cahaba operated as Medicare's agents and their
activities constituted commercial activity by Medicare." Id.

Specifically, Stone explained that Medicare is administered by CMS. Gov't App. ¶ 1. She also testified that there were two Medicare intermediaries during the relevant time period: Cahaba Safeguard Services, which was responsible for fraud detection and prevention, and Cahaba Government Benefit Administrators, which processed and paid out Medicare claims. Id. ¶ 2. And Stone detailed how Medicare and its contractors manage claims, including the electronic bill submission and claims reimbursement systems used by Medicare. Id. ¶ 4.

Viewing this evidence in the light most favorable to the Government, a rational jury could have found that Cahaba and CMS were agents of Medicare, such that any conduct on their part--namely, processing and paying out claims for hospice services--is attributable to Medicare. For these reasons, Defendant's argument concerning insufficient evidence that Medicare was a health care benefit program fails.

B.   Evidence of Defendant's Intent to Defraud Medicare

Defendant next argues that the Government failed to present sufficient evidence as to § 1347's intent to defraud element, because the testimony of the Government's "chief witness," Alex Pugman, established that Defendant "was not part of the conspiracy and that the government was well aware of that because of Title III tapes in Russian which confirmed that the

conspirators kept her out of it for fear she would report them." Def.'s Mot. Acquittal at 7. Specifically, she points to Pugman's testimony on cross-examination that after the FBI searched HCH's office in March 2008, Pugman went into Defendant's office, apologized to her, and admitted that he had lied to her about whether patients were appropriate for hospice services. Id. She also argues that "[n]o witness testified that [she] intended to defraud anyone by any document in any count of conviction." Id. at 8.

Defendant, however, does not cite to any authority for the proposition that the testimony of any one witness, even the prosecution's chief witness, negates an element of the offense entirely. When ruling on a Rule 29 motion, the Court cannot assess the credibility of witnesses or assign weight to certain pieces of evidence. Brodie, 403 F.3d at 133. As the Government notes in its response, "Pugman's testimony on cross-examination in which he attempted to minimize McGill's role in the fraudulent scheme is only one piece of the universe of evidence which the jury had to consider."[5] Gov't's Resp. at 12, ECF No. 429.

---

[5]     The Government also takes issue with Defendant's contention that Pugman's testimony, when considered as a whole, was exculpatory. For example, the Government points to Pugman's testimony that he was aware that McGill has pre-signed death certificates. Gov't's Resp. at 13. Pugman also clarified on redirect examination that McGill played a role in the HCH fraud

Defendant's contention that "[n]o witness testified that Mrs. McGill intended to defraud anyone by any document in any count of conviction," Def.'s Mot. Acquittal at 8, is also unavailing. The Court instructed the jury that "[i]n considering whether Patricia McGill acted with the intent to defraud, you may consider, among other things, whether Patricia McGill acted with a desire or purpose to bring about some gain or benefit to herself or to someone else at the expense of Medicare or with a desire or purpose to cause some loss to Medicare." Jury Instrs. ¶ 103. The Government was not required to present direct evidence as to Defendant's intent. Rather, it could show intent to defraud from the surrounding facts and circumstances. See United States v. Klein, 515 F.2d 751, 754 (3d Cir. 1975) ("Circumstantial evidence is clearly proper to show [knowledge or intent,] especially . . . where direct evidence is likely to be scant."); see also United States v. Rosario, 118 F.3d 160, 163-64 & n.7 (3d Cir. 1997) (noting that the jury could infer intent to defraud and knowing and willful conduct from evidence that the defendant forged the instrument).

And finally, to the extent that Defendant argues that her acquittal on the conspiracy count is inconsistent with the jury's verdicts on certain substantive health care fraud counts,

---

scheme, although, in his opinion, she was less involved than others. Id.

this argument does not present a ground for acquittal on the
substantive counts. At the hearing, defense counsel conceded
that inconsistent verdicts are ordinarily not a bar to
conviction but maintained that the indictment in this case
presents an exception to this general rule, because, according
to defense counsel, conspiracy to commit health care fraud, in
violation of § 1349, and participation in a scheme to commit
health care fraud, in violation of § 1347, require the "same
intent." Defense counsel, however, has failed to point to any
authority in support of this proposition.

As a general rule, the Supreme Court has held that
"inconsistent verdicts are constitutionally tolerable." Dowling
v. United States, 493 U.S. 342, 353-54 (1990) (citing Standefer
v. United States, 447 U.S. 10, 25 (1980)); see also United
States v. Powell, 469 U.S. 57, 65 (1984). When a defendant is
acquitted on one count and convicted on another, "in most
circumstances 'the most that can be said . . . is that the
verdict shows that . . . the jury did not speak their real
conclusions' on one of the convictions." United States v. Maury,
695 F.3d 227, 264 (3d Cir. 2012) (alterations in original)
(quoting Dunn v. United States, 284 U.S. 390, 393 (1932)). "As a
matter of law, courts treat this situation as an instance of
juror lenity, undeserving as a basis for overturning a

conviction." Id. (citing United States v. Vastine, 363 F.2d 853, 855 (3d Cir. 1966)).

The Court has undertaken a search of federal case law and has found that district courts apply this general rule where the defendant is found guilty of substantive health care fraud counts but acquitted of conspiracy to commit health care fraud. See United States v. Adegboye, No. 11-0030, slip op. at 6 (W.D. Okla. Oct. 13, 2011) (denying the defendant's motion for a new trial where the jury acquitted the defendant of conspiring to commit health care fraud but convicted him of aiding and abetting health care fraud, because "the elements of the conspiracy charge are not the same as those governing the specific allegations of health care fraud, nor . . . the elements required to show that the defendant aided and abetted the commission of the health care fraud" and the jury "was directed to consider each crime . . . separately"), aff'd, 732 F.3d 1195 (10th Cir. 2013); United States v. Shubaralyan, No. 08-0532, slip op. at 11 (C.D. Cal. Aug. 14, 2009) (rejecting the defendant's argument that the inconsistency of her convictions of the § 1347 substantive counts of health care fraud and acquittal on the § 1349 conspiracy count was grounds for acquittal or a new trial), aff'd, 428 F. App'x 685 (9th Cir. 2011).

Turning to the evidence presented at trial in this case, a rational jury could infer Defendant's intent to defraud from her conduct. The Court will briefly summarize some of that evidence here.

Count 3 pertained to HCH patient F.G. Special Agent Hirschy testified that F.G. was admitted and discharged from hospice by HCH five separate times between May 2006 and October 2008. Gov't App. ¶ 133; Gov't Ex. 21. F.G. was one of the patients selected for discharge by Pugman and McGill in October 2007 in response to the Medicare cost cap issue. Gov't App. ¶¶ 25, 49-51; Gov't Ex. 15 (voicemail from McGill to Richard Barber explaining the need to "thin the herd" of "stable" patients for "monetary" reasons). After HCH resolved the cost cap issue, F.G. was re-admitted by HCH--a practice that McGill admitted was fraudulent in recorded conversations. Gov't App. ¶¶ 26, 126-27. For instance, McGill told Irina Chudnovsky that "[i]f Medicare comes in and brings the feds in with them, he'll lose this company." Id. ¶ 127.

F.G. did not die until January 2011. Id. ¶ 133. Eugenia Roytenberg, an RN employed at HCH, testified that F.G. was inappropriate for hospice. Id. ¶ 107. Roytenberg testified that F.G.'s patient file contained Interdisciplinary Team ("IDT") care plan meeting records signed by McGill for December 2006 as well as a large portion of 2008. Id.

24

Count 4 pertained to HCH patient M.Q. Richard Barber, another RN at HCH, testified that M.Q. remained on hospice from November 2005 through February 2007. Id. ¶ 57. Barber testified about IDT care plan meeting records signed by McGill for nearly the entire time that M.Q. remained under HCH's care. Id.

Barber further testified about cycling M.Q. on and off hospice. Specifically, he stated that M.Q. was discharged from HCH in January 2007 because she was admitted to a hospital. Id.; Gov't Ex. 22. After her hospital stay, M.Q. was re-certified for hospice services four times between April and December 2007. Gov't App. ¶ 57.

Barber testified that M.Q. was discharged from HCH on November 4, 2007, due to the Medicare cost cap. Id. Thereafter, M.Q. was re-enrolled in HCH hospice care for the period between May 23 and July 21, 2008, after the Medicare cost cap issue was resolved. Id. During this time, M.Q. was revoked and discharged on May 30, 2008, because she went into the hospital. Id. M.Q. returned to HCH after she was discharged from the hospital and re-certified from July 2 to August 30, 2008, and from August 31 to October 29, 2008. Id. Defendant signed IDT care plan meeting records for M.Q. during this period. Gov't Exs. 22-4, 22-6.

M.Q. did not pass away until January 2014. Gov't Ex. 16. Barber testified that M.Q. was not appropriate for hospice. Gov't App. ¶ 57. He testified that he wrote false continuous

care notes for M.Q. Id. ¶ 58; Gov't Ex. 22-6, 22-7. In addition, Barber testified that Timothy Wiley wrote false continuous care notes for M.Q. that were incorporated into her patient file. Gov't App. ¶ 58; Gov't Ex. 22-5. Cecelia Wiley, HCH's office manager, testified that her husband, Timothy Wiley, a high school janitor, never trained as a home health aide ("HHA") or received an HHA certification, but was paid $9/hour by HCH to fabricate continuous care notes. Gov't App. ¶ 76. McGill signed HCH training records for Timothy Wiley, even though he never attended such trainings. Id. ¶ 78.

Count 9 concerned HCH patient J.G., who was a patient of HCH nurse Christine Parker. Id. ¶ 100. Parker testified that she did not believe J.G. was appropriate for hospice care and that she shared this concern with McGill. Id. Barber also testified that he cared for J.G. and that she was inappropriate for hospice care. Id. ¶ 63. Specifically, Barber testified that J.G. was inappropriate at the time he initially enrolled her in HCH in September 2005. Id. McGill signed IDT care plan records for J.G. for various time periods between September 2005 and April 2007. Id.; Gov't Ex. 27-2.

Parker testified that in April 2007, she told McGill that Luda Novikov, a nursing supervisor at HCH, asked her to change J.G.'s weight in her patient file. Gov't App. ¶ 101. Parker refused to make the change. Id. ¶ 102. A few days later,

26

Parker checked J.G.'s file and discovered that someone else had changed the patient's weight. Id. Parker took the file to McGill and showed her the false entry. Id. Although McGill removed the page from the file while Parker was present, Parker testified that she checked the file again a few days later and discovered the page containing the fabricated weight had been placed back in the file. Id. The false entry was included in the patient file submitted to Medicare during Cahaba's audit of HCH. Gov't Ex. 27-3.

Finally, Count 14 pertained to HCH patient J.H. Ed Hearn, an RN who worked at HCH, testified that J.H. was inappropriate for hospice care. Gov't App. ¶ 92. J.H. was admitted for hospice services in December 2006 and not re-certified in October 2007. Id. ¶ 136. Hearn identified IDT care plan meeting records for J.H. signed by McGill for the period between January and September 2007. Gov't Ex. 32-1. Hearn testified that J.H. was selected for discharge by Pugman and McGill when the Medicare cost cap problem surfaced and was never re-admitted by HCH. Gov't App. ¶ 92. J.H. died several years later, in July 2011. Id. ¶ 136.

Pugman, who was an RN and sometimes visited HCH patients, testified that he visited J.H. on several occasions. Id. ¶ 31. During an intercepted conversation on August 15, 2007, Pugman told Cecilia Wiley that J.H. was "not hospice material."

Gov't Ex. A3. When Pugman expressed concern that medical records would not support J.H.'s hospice certification, Wiley responded, "That's okay, I can fix that." Id. Cecilia Wiley later testified that she falsified HHA Weekly Visit Notes for J.H. Id. ¶ 72; Gov't Ex. 32-2.

A rational jury could have found that McGill knew that each of these four patients was inappropriate for hospice care based on, inter alia, the length of time that the patient remained on hospice, the patient's "cycling" on and off hospice, and his or her discharge and, in most cases, later re-enrollment in hospice after HCH resolved the cost cap issue. For these reasons, Defendant's argument as to the sufficiency of the evidence of intent fails.

C.    Proof of Knowledge of Section 1347 and Medicare Regulations

Defendant next argues that she should be acquitted because the Court failed to instruct the jury that that she had "knowledge of the law or Medicare regulations she was accused of violating." Def.'s Mot. Acquittal at 12. Defendant essentially rehashes the argument she made in a pretrial motion to dismiss, ECF No. 380, which the Court rejected, ECF No. 391. Defendant again raised the argument during the charge conference, wherein defense counsel requested an instruction that the Government had to prove that McGill had actual knowledge of the health care

28

fraud statute and specific intent to violate it, thus preserving the issue. Because the Court has not previously issued a written decision on this issue,[6] the Court will address the argument here.

## 1.   Role of Medicare Regulations

Defendant claims that she was convicted of violating "Medicare hospice regulations that are confusing and complex and that the government refused to delineate, or erroneously delineated, to the jury." Def.'s Mot. Acquittal at 8. She contends that the Government's theory of the case was based on the false premise that a patient may remain on hospice for only six months pursuant to Medicare regulations, whereas the applicable regulation, 42 C.F.R. § 418.21,[7] allows for an

---

[6]      The Court did not address Defendant's motion to dismiss on void for vagueness grounds in its Memorandum on the parties' pretrial motions, ECF No. 384, because Defendant's motion to dismiss was untimely. The Final Scheduling Order directed that all pretrial motions were to be filed on or before December 16, 2015, ECF No. 345, but the motion was not filed until December 22, 2015, ECF No. 380.

[7]      The regulation referenced by Defendant is entitled "Duration of Hospice Care Coverage-Election Periods" and provides as follows:

        (a)   Subject to the conditions set forth in this part, an individual may elect to receive hospice care during one or more of the following election periods:

              (1)   An initial 90-day period;

              (2)   A subsequent 90-day period; or

unlimited number of extensions of an individual's duration of hospice care coverage--and even allows for discharge and re-admittance. Def.'s Mot. Acquittal at 9. She likewise points to the regulation requiring the hospice company to "obtain written certification of terminal illness" "based on the physician's or medical director's clinical judgment" for each election period, 42 C.F.R. § 418.22(a)(1), (b), and argues that nothing in the regulation requires nurses to review, or "police," the doctors who make these certifications. Def.'s Mot. Acquittal at 9. Defendant says that "[i]f the Government's theory is that nurses are the final arbiter, that effectively lets doctors off the hook" and isolates doctors from criminal liability by pointing at their subordinates. Id.

    The Government responds that Defendant's assertion that she was charged with criminally violating Medicare regulations and that the jury convicted her of "violating a strict six-month limit" is erroneous. Gov't's Resp. at 18.

_____

            (3)  An unlimited number of subsequent 60-
                 day periods.

    (b)  The periods of care are available in the order
         listed and may be elected separately at different
         times.

42 C.F.R. § 418.21 (2006).

Therefore, Defendant's focus on 42 C.F.R. §§ 418.21 and 418.22 is misguided.

The Government's position is correct. Defendant was not convicted of violating any one particular Medicare regulation, but rather the health care fraud statute, 18 U.S.C. § 1347. Accordingly, the focus of any due process and vagueness analysis must be § 1347, not the Medicare regulations.

Turning to § 1347, the conduct criminalized is not the violation of a Medicare regulation, such as the regulations regarding election periods or requiring a doctor's certification as to terminal illness. Rather, the crux of a violation is the defendant's acts of misrepresentation in connection with the delivery of, or payment for, health care benefits, items, or services. See United States v. Jones, 471 F.3d 478, 481-82 (3d Cir. 2006) (explaining that "[t]he plain language of [§ 1347] clearly prohibits health care fraud by knowingly or willfully using 'false or fraudulent pretenses, representations, or promises' to obtain the money or property of a health care benefit program in connection with the delivery of, or payment for, health care benefits, items, or services" and that therefore the Government must establish some "type of misrepresentation" by the defendant). Thus, the Court was not required to instruct the jury as to any particular Medicare regulation concerning the provision of hospice services.

31

Viewing the evidence in the light most favorable to the Government, a rational jury could find that McGill directed and authorized nursing staff and nursing supervisors to fabricate supporting documentation for patient files to substantiate fraudulent claims that HCH submitted to Medicare for patients inappropriate for hospice care, which involved altering patient charts and falsifying nursing notes to create the appearance on paper that the patient's medical condition was worse than it actually was. ECF No. 1. For instance, McGill instructed nurses working under her to "beef up the chart" where nursing notes did not support that the patient was appropriate for hospice service. Gov't App. ¶ 53. Intercepted conversations played during the trial also demonstrated that McGill authorized and instructed nurses to revoke hospice patients who were admitted to the hospital so that HCH would not be held responsible for hospitalization costs, see, e.g., Gov't Ex. 25; Gov't App. ¶ 55, and that McGill oversaw the selection of patients to be discharged when HCH was alerted to the Medicare cost cap problem and the later re-enrollment of many of those patients, see, e.g., Gov't App. ¶¶ 25, 49-52, 126-27.

A rational fact finder might also have found that McGill personally filled in gaps in nursing notes. As described above, evidence was presented at trial that McGill falsified training certifications for Timothy Wiley, a janitor with no

health care training, and reviewed false notes that he had
authored in patient files. The jury might also have concluded
that McGill placed the note containing the fabricated weight,
which Parker had flagged for McGill as fraudulent, back in the
patient's file.

Accordingly, the core of the allegations against
McGill, and the evidence presented by the Government at trial,
concerned acts of misrepresentation--not McGill's violation of
any one particular regulation or failure to "police" doctors.

2.    2010 Amendment to Section 1347

Defendant also argues that § 1347 was amended in 2010
"to reduce the intent requirement of the statute by adding
paragraph (b) which lessens the government's burden of proof by
eliminating the requirement of knowledge of the regulation."
Def.'s Mot. Acquittal at 11. She maintains that "[t]he 2010
change reduced the level of intent required to prove a violation
of health care fraud under 18 U.S.C. § 1347, and thus made it
easier for the government to prove a violation." Id. at 12. She
submits that before the amendment, the Government was required
to show the defendant's specific intent to violate § 1347. Thus,
"[t]he failure to elicit from witnesses evidence of Mrs.
McGill's knowledge of the regulation and her intent to violate

33

it is an ex post facto and due process violation," because it lowered the Government's burden of proof. Id. at 18.

Defendant, however, fails to point to anything in the legislative history for the 2010 amendment suggesting that Congress intended to change the statute's mens rea requirement. Nor does she contend with the Third Circuit case, which was brought by one of her co-defendants, dealing with this precise issue, United States v. Shvets, 631 F. App'x 91 (3d Cir. 2015), cert. denied, 136 S. Ct. 1526 (2016).

Defendant points only to a 2011 case from the Northern District of Georgia, United States v. Houser, No. 10-012, 2011 WL 2118847 (N.D. Ga. May 23, 2011). Def.'s Suppl. Br. at 2. A closer reading of Houser reveals that it does not support Defendant's proposition.

In Houser, the district court adopted the report and recommendation ("R&R") of a magistrate judge denying the defendants' motion to dismiss the indictment, which charged conspiracy and health care fraud in violation of §§ 1349 and 1347, respectively. 2011 WL 2118847, at *1. The magistrate judge included the post-2010 version of § 1347 in the R&R. Id. at *5. Defendants objected to this citation, arguing that the application of the amended statute violated the ex post facto clause and the Due Process clause. Id.

34

The <u>Houser</u> court found that "the amended statute d[id] not apply to Defendants," because it "<u>arguably</u> lessens the mens rea, and the Government's allegations involve[d] conduct that took place between June 2004 and September 2007." <u>Id.</u> (emphasis added). However, the court concluded that the inclusion of the prior version of § 1347 in the R&R was "a clerical error" and overruled the defendants' objection to this citation, since "the Indictment charges Defendants with a violation of the prior version of § 1347." <u>Id.</u> The <u>Houser</u> court therefore did not determine whether the 2010 amendment <u>actually</u> lessened § 1347's mens rea requirement or whether the defendants' ex post facto argument was correct. Accordingly, <u>Houser</u> does not support McGill's argument.

The Court instead turns to a case that squarely addressed the issue of whether the 2010 amendment changed the mens rea requirement: <u>United States v. Shvets</u>, 631 F. App'x 91 (3d Cir. 2015) (nonprecedential). On appeal, Shvets, a former HCH nurse, argued that § 1347 required "proving defendant's knowledge of the statutes alleged to make her conduct criminal" and that "the 'knowingly and willfully' element attaches to a separate provision defining 'health care benefit program[s]' as those which 'affect[] commerce.'" <u>Id.</u> at 92 (alterations in original). The Third Circuit found:

The proper definition of "willfully" under § 1347 hinges primarily on the nature of a 2010 amendment to the statute, which states that "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. § 1347(b). The pre-2010 version of § 1347, under which Shvets was charged and convicted, does not contain this provision and is silent as to the definition of willfulness under the statute. Therefore, the question is whether the 2010 amendment represents a substantive change in the statute's mens rea requirement, or whether it was merely clarifying in nature.

As conceded by Shvets' trial counsel, the legislative history of the 2010 amendment forecloses Shvets' current argument that § 1347 requires proof of the defendant's knowledge of the statute. <u>See</u> 155 Cong. Rec. S10853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman) ("The bill . . . addresses confusion [and] . . . clarifies that 'willful conduct' in this context does not require proof that the defendant had actual knowledge of the law in question or specific intent to violate that law."). And the weight of the case law interpreting § 1347 and the analogous Anti-Kickback statute, 42 U.S.C. § 1320a-7b, only strengthens this conclusion. <u>See</u> <u>United States v. Davis</u>, 132 F.3d 1092, 1094 (5th Cir. 1998) (requiring "specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law"); <u>United States v. Starks</u>, 157 F.3d 833, 837-39 (11th Cir. 1998) (holding that knowledge of the Anti-Kickback statute was not required); <u>United States v. Jain</u>, 93 F.3d 436, 440-41 (8th Cir. 1996) (requiring proof that the defendant "knew that his conduct was wrongful, rather than proof that he knew it violated a known legal duty"); <u>United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.</u>, 874 F.2d 20, 33 (1st Cir. 1989) (holding that "willfully" means to do something the law prohibits).

The only court of appeals to find that the pre-2010 version of § 1347 or the Anti-Kickback statute required a heightened level of intent is the Ninth Circuit. <u>See</u> <u>Hanlester Network v. Shalala</u>, 51 F.3d 1390, 1400 (9th Cir. 1995) (holding that

36

"knowingly and willfully" in the Anti-Kickback statute required defendants to have knowledge of the statute and "specific intent to disobey the law"). However, the 2010 amendment to § 1347 rejected this interpretation, codifying the majority view. See 155 Cong. Rec. S10853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman) ("This heightened mental state requirement may be appropriate for criminal violations of hyper-technical regulations, but it is inappropriate for these crimes, which punish simple fraud.").

The District Court's willfulness instruction was not erroneous.

Id. at 95-96.

The Court has also conducted an independent review of the legislative history and, supplementing the Third Circuit's conclusion in Shvets, finds that it forecloses Defendant's argument.

The health care fraud statute was originally enacted as part of the Health Insurance Portability and Accountability Act of 1996. Pub. L. No. 104-191, tit. II, § 242(a)(1), 110 Stat. 1936, 2016-17 (1996). The legislative history in connection with the original version of the statute provides that the offense of health care fraud "should require proof of a knowing and willful pattern of behavior" to "assure honest mistakes by health care providers would not result in criminal conviction or imprisonment." H.R. Rep. No. 104-747, at 13 (1996).

Although the 2010 amendment to the health care fraud statute was ultimately enacted as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, tit. X, § 10606(b), 124 Stat. 119, 1008 (2010), the amendment was initially proposed in a bill entitled the "Health Care Fraud Enforcement Act of 2009," S. 1959, 111th Cong. § 2(b) (2009), which was sponsored by Senators Edward Kaufman and Patrick Leahy, among others. Legislative history for the bill makes clear that the amendment was clarifying in nature and not intended to change the mens rea requirement:

> Both the Anti-Kickback Statute (42 U.S.C. § 1320a-7b) and the health care fraud statute (18 U.S.C. § 1347) include the term "willfully." In both contexts, the Ninth Circuit Court of Appeals has read the term to require proof of a heightened and unwarranted mens rea on the part of the defendant. See Hanslester Network v. Shalala, 51 F.3d 1390 (9th Cir. 1995) (on appeal from an administrative exclusion proceeding, construing "knowingly and willfully" in the anti-kickback statute as requiring proof both that defendants know that the statute prohibits offering or paying remuneration to induce referrals and that defendants engage in the prohibited conduct with the specific intent to disobey the law); United States v. Awad, 551 F.3d 930 (9th Cir. 2009) (holding that "willfully" in 18 U.S.C. § 1347 requires the government to prove that the defendant was aware that the conduct in question was unlawful). This heightened scienter requirement may be appropriate for criminal violations of hyper-technical regulations, but it is inappropriate for these crimes, which punish simple fraud. The Finance Committee health care reform bill (America's Healthy Future Act) addresses this problem for the Anti-Kickback Statute, but not for 18 U.S.C. § 1347. Accordingly, this section tracks the finance bill and clarifies that "willful conduct" in this context does not require proof that the defendant had

> actual knowledge of the law in question or specific
> intent to violate that law.

Press Release, Sen. Patrick Leahy, Leahy, Judiciary Committee Members Introduce Health Care Fraud Enforcement Bill (Oct. 28, 2009) (section-by-section explanation of various provisions of the bill), available at https://www.leahy.senate.gov/press/ leahy-judiciary-committee-members-introduce-health-care-fraud-enforcement-bill.

When introducing the bill in the Senate, Senator Kaufman explained that the bill "addresses confusion in the case law over the appropriate meaning of 'willful' conduct," and referenced "the heightened mental state requirement" imposed by the Ninth Circuit. 155 Cong. Rec. S10853 (daily ed. Oct. 28, 2009). Senator Kaufman went on to explain that the bill "clarifies that 'willful conduct' in this context does not require proof that the defendant had actual knowledge of the law in question or specific intent to violate that law." Id. (emphasis added). Senator Leahy likewise explained that "[t]he bill clarifies the intent requirement of [the] health care fraud statute." Id. at S10854 (emphasis added). The legislative history, therefore, says nothing about changing the mens rea requirement for health care fraud or somehow making it easier to prosecute these offenses in circuits outside of the Ninth Circuit.

Although the case is nonprecedential, the Court agrees with <u>Shvets</u>, especially after undertaking its own review of the legislative history in connection with the 2010 amendment. A charge of violation of § 1347 is one of "simple fraud," and the Government was not required to prove that McGill had knowledge of § 1347 or any particular Medicare regulation.

For these reasons, Defendant's due process and fair notice argument fails as a matter of law.

D.   <u>McGill's Nonparticipation in Billing</u>

Defendant next argues that "[t]here was no proof at trial that she submitted any bills or assisted in their submission."[8] Def.'s Mot. Acquittal at 12. Defendant's focus on

---

[8]      At the hearing, defense counsel seemed to present a slightly different argument. Although she never used the terms "constructive amendment" or "variance," she seemed to suggest that the evidence presented at trial as to McGill's role in the health care fraud scheme was different than that charged in the Indictment, which alleged that she committed fraud "by submitting and causing to be submitted fraudulent health care insurance claims for patients in the approximate amounts listed [in the Indictment] for hospice services purportedly provided by Home Care Hospice over the dates identified [in the Indictment] when defendant McGILL knew the claims were fraudulent." Indictment at 12 ¶ 2, ECF No. 1. Because defense counsel has not presented any authority as to a possible constructive amendment or variance (nor did she preserve such claims during the trial), the Court will not address such arguments here. <u>See United States v. Vosburgh</u>, 602 F.3d 512, 531-32 (3d Cir. 2010) (explaining the differences between a constructive amendment and variance of the indictment).

the submission of bills to Medicare is misguided for at least three reasons.

First, and most importantly, the Government was required to show only that Defendant "devised or participated in a scheme to defraud Medicare and to obtain, by means of false or fraudulent pretenses, representations, or promises, [money from Medicare]." Jury Instrs. ¶ 91 (emphasis added). Thus, the submission of bills is not an element of the health care fraud offense.

Second, even if the submission of bills to Medicare were an element of the offense, the jury was not required to find that McGill submitted those bills herself. The jury was instructed as to an aiding and abetting theory of liability, pursuant to 18 U.S.C. § 2. Id. ¶¶ 109-16. Under § 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2.

And, third, it is not necessary that participants in a health care fraud scheme actually submit a fraudulent claim, because § 1347 also punishes "attempts to execute" a fraudulent scheme or artifice. 18 U.S.C. § 1347(a).

Defendant relies on a case from the Tenth Circuit, United States v. Kline, 922 F.2d 610 (10th Cir. 1990), in support of her argument. The Kline court held that there was

41

insufficient evidence that the defendant made and presented
Medicare claim forms to support her conviction under the False
Claims Act, 18 U.S.C. § 287, where there was no evidence that
the defendant did the billing herself and the defendant's co-
worker, who did the majority of the billing, testified that she
did not understand differences in the billing codes and had
therefore made mistakes when submitting claims. Id. at 611-12.
The False Claims Act, unlike the health care fraud statue,
requires proof that "the defendant knowingly made and presented
to a department or agency of the United States a false,
fraudulent or fictitious claim against the United States." Id.
at 611. Defendant's reliance on Kline is therefore inapposite,
because it was decided under an entirely different criminal
statute, which includes the submission of the claim as an
element of the offense.

Focusing on McGill's "participat[ion] in a scheme to
defraud" Medicare, the Government presented sufficient evidence
at trial from which a rational jury could conclude that McGill
knew HCH was billing Medicare for hospice services allegedly
provided to HCH patients. For instance, taken in the light most
favorable to the Government, the evidence showed that on May 3,
2007, McGill presided over a staff meeting during which she
explained to HCH nurses the ongoing Medicare audit and
emphasized the importance of ensuring that nursing notes and

42

other documentation supported the patient's hospice eligibility. Gov't App. ¶ 47. McGill also presided over another meeting on October 18, 2007, during which she explained problems with the Medicare cost cap to HCH nurses. Id. ¶ 50.

A rational jury could have also determined from the evidence presented at trial that McGill knew that certain patients did not meet Medicare's criteria for hospice eligibility and that certain claims were therefore fraudulent. During the October 18, 2007, meeting, McGill told HCH staff that submitting claims to Medicare for inappropriate patients constituted health care fraud. Id. ¶ 21; Gov't Ex. 17, at 7 ("They have to meet criteria. . . . Here's the deal, it's fraud if you are keeping them on and they don't need to be on, it's fraud . . . ."). And, in a voicemail to Richard Barber on October 16, 2007, McGill directed the discharge of a number of patients after HCH received notice of the Medicare cost cap. Gov't App. ¶ 50; Gov't Ex. A16. As explained above, the evidence also showed that McGill knew the length of time that certain patients remained on hospice service and that patients were being cycled on and off hospice care, because she participated in IDT care plan meetings for these patients.

Finally, the evidence showed that McGill assisted Pugman and other HCH employees with the submission of fraudulent claims, because, in supervising the nursing staff, she reviewed

43

patient charts and otherwise instructed her subordinates to
ensure that the nursing notes and other materials supported the
Medicare claims. Because the jury was charged with an aiding and
abetting theory, it need only find that Pugman and others
carried out a scheme to defraud Medicare by submitting
fraudulent claims for hospice-inappropriate patients and for
services that were never provided and that McGill aided and
abetted in this scheme.

　　　　For these reasons, the Court will deny Defendant's
motion for acquittal based on McGill's alleged nonparticipation
in the Medicare billing process.

　　　　E.　　Statute of Limitations

　　　　McGill next argues that the four counts of which she
was convicted relate to conduct that falls outside of the five-
year statute of limitations applicable to § 1347 health care
fraud. Def.'s Mot. Acquittal at 13-14. She claims that because
the Indictment was filed on March 21, 2012, any evidence of
activities and billing that occurred before March 21, 2007, must
be stricken. Id. Defendant provides no authority in support of
this proposition. The Government, on the other hand, argues that
"if the government establishes that some part of the fraud
scheme occurred within the limitations period, then all of the
evidence relating to the scheme is admissible." Gov't's Resp. at

23.

The Court previously addressed Defendant's argument
concerning the statute of limitations in its memorandum
disposing of certain of the parties' pretrial motions. There,
the Court said the following:

Defendant also argues that the vast majority
of the substantive counts of health care fraud contain
dates of service or billings prior to March 21, 2007.
Id. at 3. Defendant argues that these counts must be
stricken or amended to begin with activities occurring
no earlier than March 21, 2007. Id.

The statute of limitations for all offenses
alleged in the Indictment is five years. 18 U.S.C.
§ 3282 (five-year statute of limitations for all
federal noncapital defenses). Because the Indictment
was filed on March 21, 2012, any conduct occurring
before March 21, 2007, would fall outside the statute
of limitations. The instant Indictment, however,
contains conduct prior to that date.

. . .

The statute of limitations generally begins
to run when a crime is complete. Toussie v. United
States, 397 U.S. 112, 115 (1970). However, the statute
of limitations for a continuing offense begins to run
at the end of the last act that was part of the
offense. United States v. Amirnazmi, 645 F.3d 564, 592
(3d Cir. 2011).

. . .

Although the Third Circuit has not addressed
whether health care fraud under 18 U.S.C. § 1347 is a
continuing offense, other courts of appeals and
district courts within this Circuit have held that it
is--a "conclusion [that] logically follows from
§ 1347's 'scheme' language." United States v. Salerno,
No. 10-0301, 2011 WL 6141017, at *4 (M.D. Pa. Dec. 9,
2011) (citing United States v. Davis, 471 F.3d 783,
791 (7th Cir. 2006); United States v. Hickman, 331

F.3d 445, 447 n.8 (5th Cir. 2003)). Each of the health care fraud counts contains dates within the five-year statute of limitations period. Accordingly, the substantive counts are also timely.

Defendant claims that "the objective of the scheme was complete by February 23, 2007," when HCH was notified by a Medicare contractor that it was going to be audited. Notice of the audit, however, did not terminate the conspiracy. The Third Circuit has noted that "[a] conspiracy may have multiple objectives, and the conspiracy endures beyond the attainment of its principal goal if 'other subsidiary objectives' have yet to be achieved." United States v. Vasquez-Uribe, 429 F. App'x 131, 135 (3d Cir. 2011) (nonprecedential) (quoting United States v. Walker, 653 F.2d 1343, 1349-50 (9th Cir. 1981)). Relevant here, "where enrichment is an object of a conspiracy, the conspiracy continues until the conspirators receive the full economic benefits anticipated by their scheme." Id. (quoting United States v. McNair, 605 F.3d 1152, 1214 (11th Cir. 2010)). In this case, HCH continued to receive Medicare reimbursements for inappropriate patients through at least December 2008, even after notification of the audit. Accordingly, the conspiracy continued until at least December 2008.

Defendant claims that acts of concealment committed by the HCH defendants were not acts in furtherance of the conspiracy. In Grunewald, however, the Supreme Court drew a distinction between "acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." 353 U.S. at 405. Grunewald therefore "directs [the court's] attention to the function served by the act of concealment in relation to the objectives of the conspiracy." United States v. Pecora, 798 F.2d 614, 630 (3d Cir. 1986). In analyzing an act of concealment, the court is to give the "in furtherance" requirement broad interpretation. Id. For instance, where "the concealment of the existence of the conspiracy served not only to cover up . . . past participation in criminal behavior, but to shield the ongoing conspiracy as well" such that "concealment enables the defendants to continue their illegal

payoff scheme," those acts could be found in furtherance of the conspiracy. Id. In the instant case, acts of concealment charged in the Indictment occurred during the execution of the fraud scheme, not after the scheme was terminated.

For the reasons discussed above, the Court will deny Defendant's motion in limine to strike the indictment as time-barred or otherwise amend the indictment to conform to the statute of limitations.

ECF No. 384 at 31-36.

The portions of the Court's Memorandum excerpted above fully address this issue. Because health care fraud (like conspiracy) is a continuing offense and HCH submitted fraudulent claims to Medicare for the four patients at issue during the five-year period preceding the return of the Indictment, there is no statute of limitations issue. Accordingly, the Court will deny Defendant's motion for acquittal on statute of limitations grounds.

F.   Government Agent's Role in Counts 4 and 9

Finally, Defendant argues that Richard Barber was acting as a government agent at the time he falsified records in the patient files at issue in Counts 4 and 9. Def.'s Mot. Acquittal at 14. She argues that she cannot be convicted of those two counts because "the acts of a government agent cannot be used against her as a basis to convict." Id. The Government responds that there was no evidence adduced at trial that Barber was acting on FBI instructions when he made false entries in HCH

47

records. Gov't's Resp. at 24. Rather, "Barber testified that he made false entries in patient files on the orders of McGill, Pugman, and other HCH employees who were themselves acting on the orders of Pugman." Id.

Defendant does not point to any authority in support of this argument, and therefore the Court is left uninformed on the precise legal basis for her claim.

Defendant's argument cannot be based on the simple fact that Barber at times acted as an FBI agent. "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." Jacobsen v. United States, 503 U.S. 540, 548 (1992) (quoting Sorrells v. United States, 287 U.S. 435, 441 (1932)). Of course, it is also well settled that Government agents may not originate a criminal design, implant the disposition to commit a criminal act in a criminal person's mind, and then induce the commission of the crime so that the Government may prosecute. Id. Defendant's argument seems to be based on this principle, likely sounding in an entrapment defense or perhaps an argument that the Government's conduct violated the Due Process Clause of the Fifth Amendment. For the

sake of completeness, the Court will address each of those subjects below.

Entrapment and the related due process defense are based on the notion that it "serves no justifying social objective" for the Government "to creat[e] new crime for the sake of bringing charges against a person [it] had persuaded to participate in wrongdoing." United States v. West, 511 F.2d 1083, 1085 (3d Cir. 1975). While the defenses share some similarities, the focus of the entrapment defense is on the conduct of the defendant, whereas the focus of the due process defense is on the conduct of the government agent himself. United States v. Lakhani, 480 F.3d 171, 177-78 (3d Cir. 2007)

The defense of entrapment focuses on the conduct of the defendant. Id. at 178. The concern at the heart of the entrapment defense is the defendant's non-predisposition to commit the offense. United States v. Fedroff, 874 F.2d 178, 182 (3d Cir. 1989). It is a "relatively limited defense" that exculpates a defendant only "when the Government's deception actually implants the criminal design in the mind of the defendant.'" Id. at 181 (quoting United States v. Russell, 411 U.S. 423, 436 (1973)). Once the defendant properly raises an entrapment defense, the Government may disprove the defense by showing "(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already

49

formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." United States v. Gambino, 788 F.2d 938, 945 (3d Cir. 1986) (quoting United States v. Viviano, 437 F.2d 295, 299 (2d Cir. 1971)).

The defense of due process, on the other hand, focuses exclusively on the Government's conduct. Lakhani, 480 F.3d at 177. Where a Government agent's actions are "so outrageous" as to be "shocking to the universal sense of justice," the Due Process Clause can function as an "absolut[e] bar [on] the [G]overnment from invoking judicial processes to obtain a conviction." Id. at 177-78 (alterations in original) (quoting Russell, 411 U.S. at 431-32). Although there is no sharply defined standard for application of the defense, id. at 181, "the challenged conduct must be shocking, outrageous, and clearly intolerable." United States v. Nolan-Cooper, 155 F.3d 221, 230-31 (3d Cir. 1998) (quoting United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992)). The Third Circuit has noted that courts are "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir. 1996). The principle should be invoked only when confronted with "the most intolerable government conduct"--"not each time the government

acts deceptively or participates in the crime that it is investigating." Lakhani, 480 F.3d at 180 (quoting Nolan-Cooper, 155 F.3d at 231). And courts must take care that a defendant is not attempting to invoke due process "merely as a device to circumvent the predisposition test of the entrapment defense." Id. (quoting Nolan-Cooper, 155 F.3d at 231).

Defendant requested an entrapment defense[9] instruction at trial but the Court rejected the instruction, finding that Defendant had not presented evidence of non-predisposition, as required for the defense. As to a due process defense, Defendant has presented no evidence that Barber's falsification of patient records was done solely at the FBI's direction, let alone that the conduct was "outrageous." Because Defendant has not pointed to any other legal principle under which she might prevail, Defendant's argument based on Barber's involvement in falsifying patient files fails.

## IV.  MOTION FOR NEW TRIAL

In the alternative, Defendant moves for a new trial under Rule 33. She claims that "[t]he cumulative errors by the government so infected the jury's deliberations that they

---

[9]     Defendant initially indicated that she wished to raise the defense of entrapment by estoppel. ECF Nos. 360, 378. At the charge conference, however, Defendant requested only an instruction as to a run-of-the-mill entrapment defense.

influenced the verdict and a new trial should be granted." Defendant, however, does not identify any specific errors by the Government that occurred during the trial. Assuming that she relies on the same "errors" identified in her motion for acquittal, Defendant has not shown that these errors present "serious danger that a miscarriage of justice has occurred--that is, that an innocent person has been convicted." Johnson, 302 F.3d at 150 (quoting United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994)). As such, Defendant's motion under Rule 33 will be denied.

**V.    CONCLUSION**

      For the reasons above, the Court will deny Defendant's motion for acquittal or for a new trial. An appropriate order follows.